IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

GEORGE R. AKINS, )
)
    Plaintiff, )
)
v. ) Civil Action No.: 02-PT-701-M
)
UNUM LIFE INSURANCE COMPANY )
OF AMERICA, et al., )
)
    Defendants. )

## MEMORANDUM OPINION

This cause comes on to be heard upon the Parties' cross-Motions for Summary Judgment. Plaintiff George R. Akins ("Akins") filed his Motion on November 29, 2002. Defendant UNUM Life Insurance Company of America ("Unum") filed its Motion on December 2, 2002.

### FACTS AND PROCEDURAL HISTORY

At all times relevant to these Motions, Akins was employed as a Transportation Dispatcher for the Earthgrains Company ("Earthgrains").[1] In connection with his employment, Akins was covered under a group long-term disability insurance policy ("the Plan"), which both Parties agree qualifies as a "welfare benefit plan" under the Employee Retirement Income Security Act ("ERISA").[2] Pertinent sections of the Plan include the following:

> You are disabled when UNUM determines that:
>
> - You are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and

---

[1] Earthgrains was originally named as a defendant in this action, but has since been dismissed. *See* Court Order of Oct. 29, 2002 (Doc. 24). There is some dispute as to Earthgrains' correct name; however, the court will refer to Akins' employer as Earthgrains.

[2] *See* 29 U.S.C. §§ 1001, *et seq.*

- You have a 20% loss in your **indexed monthly earnings** due to the same sickness or injury.

You will continue to receive payments beyond twenty-four (24) months if you are also:

- working in any occupation and continue to have a 20% or more loss in your **indexed monthly earnings** due to your sickness or injury; or
- not working and, due to the same sickness or injury, are unable to perform the material and substantial duties of any gainful occupation for which you are reasonably fitted by education, training, or experience.

*See* Claim File at 191 (emphasis in original); Pl. Br. at 2.[3]

On March 29, 1999, Akins suffered a "myocardial infarction," i.e., a heart attack. *See* Claim File at 3. Akins subsequently underwent two stent placement procedures to try and alleviate his condition. *Id.* at 74-110. Although Akins initially returned to work after these procedures, he stopped working in May of 1999. He began drawing on his retirement in July of 1999. *Id.* at 27.[4]

Akins began the process of filing for disability benefits in May of 2000. *Id.* at 7-8. After receiving Akins' initial documentation, Unum sent a letter to Akins informing him that it required additional information. Specifically, Unum needed two forms: an Employer's Statement, and a Job Analysis. *Id.* at 30. One month later, Unum sent another letter asking for the forms. *Id.* at 32. Akins did not provide the information until November of 2000, at which time Unum began reviewing Akins' claim. *Id.* at 35.

As part of its review, Unum contacted Akins, asking him to provide information regarding his job duties, his medical condition, and his treatment. *Id.* at 38-46. Akins stated that

---

[3]Both Parties submit the entire claim file as part of the record. *See* Def. Ex. 1; Pl. Ex. 1-A.

[4]Unum states that Akins took "early retirement." *See* Def. Ex 1 at 46. Akins states that he quit, and then began drawing on his already vested retirement income. *See* Pl. Resp. to Def. Motion at 1.

2

he could not work because it was "too much, get tired even before lunch. Even 1/2 days hard." *Id.* at 41. However, Akins also stated that he could do some limited activity, such as fishing and mowing the lawn. *Id.* at 43. Unum also requested medical records from the physicians that Akins identified on his claim form as those who were treating his conditions. *Id.* at 56-57. These records indicated that Akins suffered from, among other things, ischemic heart disease, peripheral vascular disease, coronary artery disease, atherosclerotic vascular disease, and claudication symptoms. *Id.* at 89-111. Records labeled by Unum as "pertinent" to its decision includes the following:

> 4/5/99: Discharge summary from Riverview Regional Medical Center. Akins received the stents on March 29 and April 4, 1999. Dr. Bryan Hathorn, who performed the procedures, stated that Akins "tolerated these procedures well and was fully ambulatory on the 5th of April." *Id.* at 77.
>
> 4/29/99: Follow-up visit with Dr. Hathorn. Dr. Hathorn states that Akins "is doing very well," and that Akins "has been very active and is apparently anxious to go back to work." *Id.* at 96.
>
> 5/13/99: Follow-up visit with Dr. Hathorn. Dr. Hathorn states that Akins has had some leg pain and that there is "some history of possible peripheral vascular disease." However, Akins denied having angina (chest pain). Dr. Hathorn notes that Akins "has had a little bit of fatigue but no overt shortness of breath or congestive heart failure." *Id.* at 95.
>
> 8/19/99: Office visit with Dr. Hathorn. Dr. Hathorn states that Akins "is doing fine with no complications. No angina. He has been fishing and enjoying it." *Id.* at 92.
>
> 2/15/00: Akins is seen by Dr. Hanson because Dr. Hathorn has left the practice. Dr. Hanson notes that Akins had some limping and had a heart murmur. However, Dr. Hanson also notes that Akins denied having chest pain or shortness of breath. Dr. Hanson also records that "[Akins] states that he was forced to retire because of his cardiac and vascular problems." *Id.* at 93.
>
> 5/23/00 - Akins went to see Dr. Hanson, but left before Dr. Hanson could see him. Akins did have his vital signs taken. *Id.* at 94.

3

> 8/22/00: Akins had a follow-up with Dr. Hanson. Akins told Dr. Hanson "that he needed a letter stating that he has permanent disability since his myocardial infarction in March and April 1999. I [Hanson] dictated a letter to that effect." *Id.* at 91.
>
> 1/4/01: Akins had a follow-up with Dr. Hanson. Akins stated that he "had one brief episode of angina that was relieved by one Nitroglycerin." *Id.* at 90.

*See also id.* at 144-45 (listing pertinent records in letter to Akins).[5] Unum also received a "Physician's Statement" from Dr. Hanson in connection with Akins' application. *Id.* at 5-6. Dr. Hanson listed Akins' as having a "Marked Limitation" in his functional capacity, and indicated that his prognosis for recovery was "poor."[6] Dr. Hanson also stated that Akins could not lift over twenty (20) pounds, or walk over one-hundred (100) feet.

In addition to medical records, Unum also received a Job Analysis completed by Earthgrains. This analysis indicated that the job of Transportation Dispatcher required frequent sitting, and only occasional standing, walking, balancing, and stooping, although "occasional" was defined as "up to 33% of the time." *Id.* at 20. Earthgrains indicated that the position never involved kneeling, crouching, pushing, pulling, or climbing stairs. *Id.*[7] Earthgrains also submitted a "Job Description" that listed the duties of a Transportation Dispatcher. *Id.* at 9-12, 16.[8]

Based on these records, several medical reviews were conducted. Unum's medical staff,

---

[5] Unum points to other records obtained during discovery as well. *See* Def. Exs. 3-4.

[6] Akins points out that, according to the American Heart Association, a patient with a "Marked Limitation" rating finds that "[l]ess than ordinary activity causes fatigue, palpitation, dyspnea, or anginal pain." *See* Pl. Br. at 5.

[7] In his deposition, Akins took issue with the fact that he "never" knelt, climbed stairs, etc. *See* Def. Ex. 2 at 25-26.

[8] Akins admitted that, on average, the extent of his lifting was one forty-pound box once a month. *See* Def. Ex. 2 at 22.

4

specifically Dr. Thomas Hashway and Pat Edwards, R.N., determined that Akins was "stable from a Cardiac Standpoint" and that his prognosis to return to work as a Transportation Dispatcher "in a sedentary to light occupation [was] good." *Id.* at 139-41. Specifically, Dr. Hashway noted that Akins' claudication would improve "with resting as needed." *Id.* at 139. Sherry Hess, a Unum nurse, conducted a separate review of Akins' records, and concluded that the "severity of his [coronary artery disease] and [peripheral vascular disease] is not objectified or supported in the current data." *Id.* at 50-52. Jill Zakroff ("Zakroff"), another Unum nurse, conducted a third review. She found that Akins was limited by his peripheral vascular disease to standing not more than one hour at a time, to walking not more than thirty minutes at a time, and to not sitting with his legs crossed. *Id.* at 112-13. Zakroff noted that these limitations would be permanent unless Akins had bypass surgery in the future. *Id.*[9] With regards to any limitations caused by Akins' coronary artery disease, Zakroff simply put a question mark. *Id.*

Paul Gagnon was the Unum customer care specialist charged with handling Akins' claim. Based on the medical reviews conducted by Unum's staff, Gagnon concluded that Akins' claim should be denied. On March 20, 2001, Gagnon sent notification to Akins that it was denying his claim. *Id.* at 142-45. Gagnon testified that he primarily relied on the review conducted by Dr. Hashway and Pat Edwards,[10] but that he did not seek clarification from Dr. Hashway about what type of rest would be needed, nor did he contact Earthgrains about whether Akins could in fact rest on the job. *See* Pl. Ex. 2 at 43-44. Gagnon also admitted that he did not seek any clarification or update from Dr. Hanson, and that he only briefly reviewed the Attending

---

[9] Akins has not had such a surgery.

[10] It is unclear to the court whether Gagnon even knew about the other reviews at the time he made the decision.

5

Physician's statement. *Id.* at 57. Gagnon admitted that he did not utilize a Social Security Administration's determination that Akins was disabled, and that he did not personally give any weight to the treating physician's opinions, although the medical team reviewing the file does. *Id.* at 70-73, 84-86.

Akins appealed Unum's decision on June 6, 2001. *Id.* at 149. The letter stated that the appeal was "based on his [Akins] receipt of Social Security disability benefits, as well as the enclosed letter from Dr. Ronald W. Hanson."[11] Upon receiving Akins' appeal, Unum conducted another review and submitted his file to a vocational consultant for additional review. *Id.* at 152-56. The vocation consultant, comparing Akins' job to a Department of Transportation job classification, classified Akins' job as "requiring a light degree of physical exertion." *Id.* at 156. Based on the second review and the vocational consultation, Judianne Demers ("Demers"), a Unum appeals consultant, upheld the decision to deny Akins' claim. *Id.* at 158-61; Pl. Ex. 1 at 6-10.[12] Demers acknowledged that Akins had been declared disabled by the Social Security Administration, but stated that SSA's qualifications "may be different" than Unum's. *See* Claim File at 159. Demers admitted that she did not refer the file for another medical review. *See* Pl. Ex. 1 at 82. She also admitted that she did not know whether Akins would be able to rest on the job. *Id.* at 68-69.

After exhausting his administrative remedies, Akins filed this lawsuit on March 19, 2002, pursuant to 29 U.S.C. § 1132(a)(1)(B). He seeks to recover benefits under the Plan.

---

[11] Unum contends that no letter was in fact enclosed. *See* Claim File at 159. However, it acknowledges that the Social Security Administration determined that Akins was disabled.

[12] Demers later admitted that she did not seek updated medical records or information on Akins. *See* Pl. Ex. 1 at 20. Demers also admitted that she did not give any weight to Dr. Hanson's letter. *Id.* at 23. Rather, she relied on the prior medical review. *Id.*

6

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the

non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I. Standard of Review

Both Parties agree that the "heightened" arbitrary and capricious standard applies to this case. Here, while the Plan gives Unum discretionary authority to determine eligibility under the Plan, there is a conflict of interest because Unum pays benefits out of its own assets.[13] *See* Pl. Br. at 10; Def. Br. at 8-9. The Parties also generally agree what the heightened arbitrary and capricious standard entails.

Under the heightened arbitrary and capricious standard, the court must first conduct a *de novo* review to determine whether its decision to deny the claim was wrong. *See Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1566-67 n.12 (11th Cir. 1990). Only if the court determines that the decision was wrong does it go on to determine if the decision was arbitrary and capricious, taking into account the decision-maker's self-interest. *Id.* at 1566-67 n.12. Under the heightened arbitrary and capricious standard, a "wrong" decision is still entitled to deference, but the degree of deference depends on the circumstances of the case. *See Brown*, 898 F.2d at 1566. The burden is shifted to the decision-maker to show that the decision was not

---

[13] A district court's review of an ERISA plan's denial of benefits under § 502(a)(1)(B) is to be reviewed *de novo*, unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case the court reviews whether the decision maker acted in an arbitrary or capricious manner. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Consistent with *Firestone*, the Eleventh Circuit has adopted three standards of review under § 502(a)(1)(B): (1) *de novo*, applicable where the plan administrator has no discretion, (2) arbitrary and capricious (abuse of discretion), where the plan grants discretion to the administrator, and (3) heightened arbitrary and capricious, where the plan grants discretion but the administrator is acting under a conflict of interest. *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1449 (11th Cir. 1997). These standards of review apply to both the administrator's construction of the plan and the factual findings associated with each individual case. *Paramore*, 129 F.3d at 1451.

tainted by self-interest. *Id.*

The real dispute surrounds what evidence the court can consider in making its determinations. Akins argues that the court is limited to the information that the decision-maker had before it when it made its decision. *See Jett v. Blue Cross & Blue Shield of Alabama, Inc.*, 890 F.2d 1137 (11th Cir. 1989). Unum argues that at the *de novo* stage, the court can consider all admissible evidence. It is only at the second stage that the court is limited to the record before the decision-maker at the time the decision was made. *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1326 (11th Cir. 2001).

## II. The Merits

### A. Unum's Position

At the outset, Unum argues that its ability to review Akins' claim was "significantly prejudiced" because he waited almost a year from the date he stopped working to file his claim, and then waited even longer to provide Unum with all the information it needed to process the claim.[14]

Next, Unum notes that the Plan requires that Akins be limited from performing the material and substantial duties of his regular occupation. However, the only restrictions and limitations identified by Akins' own physician related to walking and lifting. The Job Analysis and Job Description submitted by Earthgrains showed that Akins' job involved light tasks performed while seated, and did not involve significant amounts of walking or lifting. Unum also points out that Akins stated that the stress of worrying about another heart attack, as opposed to the physical demands of the job, is what kept him from working. *See* Claim File at

---

[14]Akins notes that this is the first time that Unum has made this argument. *See* Pl. Resp. at 2.

46.

Unum also points to Akins' own statements that he engaged in a number of normal daily activities, such as laundry, meal preparation, vacuuming, driving, yard work, and fishing. *Id.* at 43. Akins testified that he goes fishing three days a week. *See* Def. Ex. 2 at 60. He also testified that he plays golf to some extent, *id.* at 61-65, including the very weekend he quit working. *Id.* at 81.

Concerning Akins' medical condition, Unum notes that the Physician's Statement did not state that Akins could not work; rather, it simply stated that Akins needed certain restrictions to be imposed. *See* Claim File at 5-6. Akins testified that it was his decision, not his doctors, to stop working. *See* Def. Ex. 2 at 82. Dr. Hanson's letter, written fifteen months after Akins stopped working and addressed to "whom it may concern," did state that Akins was disabled. *See* Claim File at 3. However, Unum argues, no cardiologist or other doctor told Akins to stop working, and Dr. Hanson's notes clearly indicate that he wrote the letter at Akins' behest. Unum also notes that Dr. Hanson had only seen Akins once prior to writing the letter, some nine months after Akins had suffered the heart attack.[15]

Finally, Unum notes that the Plan requires that Akins remain under the "regular care" of a doctor for his condition. "Regular Care" means visiting a doctor "as frequently as is medically required" and "receiving appropriate medical treatment and care." *See* Claim File at 173. Unum notes that Akins only saw Dr. Hanson twice in all of 2000, and only three times in 2001, the last visit being September 4, 2001. *Id.* at 91-94; Def. Ex. 3. Moreover, Unum points out, between

---

[15]Unum also notes that Dr. Hanson indicated that Akins' smoking contributed to his disability. *See* Claim File at 3. Akins admitted that Dr. Hanson had told him the same thing. *See* Def. Ex. 2 at 79. At the time of his deposition, Akins was still smoking heavily. *Id.* Unum thus argues that while Akins is "worried" that he might have another heart attack, he is not so worried as to stop smoking.

10

September 4, 2001 and August 15, 2002, the date of his deposition, Akins had not seen Dr. Hanson or any other cardiologist. *See* Def. Ex. 3.[16] Akins does see a general practitioner, Dr. Tim Decker, but he has not seen Dr. Decker since February 27, 2002, *see* Def. Ex. 4, despite testifying that he saw Dr. Decker every three months. *See* Def. Ex. 2 at 52-54, 73.[17]

Unum argues that even from a *de novo* perspective, the evidence shows that Akins' condition would not keep him from performing his duties, which included only sedentary/light work. However, Unum argues, even if the court found that Akins was in fact disabled, summary judgment is nonetheless appropriate because there can be no debate that it made a reasonable decision. The medical reviews indicated that Akins could perform at his job, and no doctor ever told Akins that he needed to stop working. The only evidence indicating that Akins is disabled is Dr. Hanson's letter, which admittedly was written at Akins' request. This letter alone does not make Unum's decision arbitrary and capricious.

B. Akins' Position

Akins argues that his interpretation of the Plan is reasonable. He notes that he was restricted from lifting over twenty pounds or walking over one-hundred feet without rest, and that the Physician's Statement indicated that more than ordinary activity caused Akins to suffer fatigue, palpitation, and anginal pain. He also notes that his job required occasional walking and lifting, and that Unum did not determine exactly how much Akins would have to walk or lift at his job, or whether he would be allowed to rest at all. Moreover, Dr. Hanson wrote a letter

---

[16]Akins did go to Dr. Hanson's office on January 17, 2002, but left before he was seen. *See* Def. Ex. 3.

[17]Akins argues that Dr. Decker's records were not in front of Unum at the time it made its decision. He also argues that the records are inadmissible because they are hearsay and do not meet the requirements of Federal Rule of Evidence 803(6).

11

stating that Akins was totally disabled, and the Social Security administration made the same determination.[18]

Akins also points to what Unum did not consider to show that its decision was arbitrary and capricious. First, it notes that Demers and Gagnon admitted that they did not consider the Physician's Statement or the letter from Dr. Hanson. Second, Akins argues, Unum did not look at his overall health picture, instead focusing only on the physical requirements of the job. Specifically, Akins argues, Unum focused on his coronary artery disease and peripheral vascular disease, but ignored evidence of diseases like claudication.[19] In this respect, Akins argues, this case is similar to *Henar v. First UNUM Life Ins. Co.*, No. 02-CIV-1570, 2002 WL 31098495 (E.D.N.Y. Sept. 19, 2002). Next, Akins points out that Dr. Hashway, whose opinion Unum relied upon the most, stated that Akins could work only if he rested as needed. However, Unum made no inquiries as to whether Earthgrains would allow Akins to rest on the job.

Akins also notes that Unum's vocational consultant based his decision on a Department of Transportation job characterization, as opposed to actually examining what Akins was required to do as a Transportation Dispatcher. Akins argues that when the Plan uses the term "occupation," it means the claimant's actual occupation, not a hypothetical occupation as conceived by a government agency. Finally, Akins notes that Unum performed no physical examination of its own on him, and relied solely own its own doctors in determining that Akins could return to work. Akins cites *Holzschuh v. UNUM Life Ins. Co.*, No. Civ.A. 02-1035, 2002

---

[18] Akins notes that this court can consider the Social Security Administration's findings. *See Whatley v. CNA Ins. Co.*, 189 F.3d 1310 (11th Cir. 1999).

[19] According to Akins, claudication is defined as "lameness, limping . . . A severe pain in calf muscles occurring during walking but which subsides with rest." *See* Pl. Br. at 14.

WL 1609983 (E.D. Penn. July 18, 2002), which criticized Unum for choosing only those parts of a medical record that support its position. Akins argues that here, as in *Holzschuh*, "UNUM acted more like plaintiff's adversary than an impartial judge of its claims for benefits." 2002 WL 1609983 at *8.

Finally, Akins argues that Unum's reliance on his outside activities, such as golfing and fishing, is misplaced. Specifically, he argues that, while he had played some golf, he cannot play frequently and often only rides around in the cart. *See, e.g.,* Def. Ex. 2 at 81.

### C. Unum's Response[20]

Unum counters that although Demers and Gagnon may not have personally examined all of the medical evidence and evaluations, the record is clear that Unum's medical team, whose opinion Demers and Gagnon relied upon, did examine all the evidence. *See* Claim File at 50-52, 112-13, 139-41. Specifically, Gagnon testified that the medical team did review and give appropriate weight to all of Dr. Hanson's submissions. *See* Pl. Ex. 2 at 84-86. As for Demers, Unum argues that, contrary to Akins's assertions, she did ask Akins for updated information before making her decision. *See* Pl. Ex. 1 at 20; *see also* Claim File at 142-44 (denial letter).

Unum also notes that, although Akins complains about his overall health picture, he did not include any of his other conditions on his claim form or on the form Dr. Hanson completed. In addition, Akins stated, in his deposition, that only his heart problems and his smoking prevented him from working. Finally, Akins did not mention any of his other conditions when he filed his appeal, even though the denial letter clearly stated the reasons why the claim was denied. Unum also argues that *Henar* is distinguishable, because there, the plaintiff was the

---

[20] Akins' response to Unum's motion is included in his initial position.

chief financial officer of his company, and the intellectual demands of that occupation were documented in the employer's statement supporting the claim. Here, there is no evidence of comparable mental requirements that would prevent Akins from performing the job.[21]

Third, Unum argues that it was proper to send Akins' file to a vocational consultant. Specifically, it noted that Demers sent the file for the review to confirm that Akins' job was sedentary to light in nature. *See* Pl. Ex. 1 at 19. While Akins may complain that the evaluation was based on a Department of Transportation classification, Unum argues, Akins has failed to identify how this classification is inaccurate in any way. Further, Akins has pointed to no part of Earthgrains' Job Description or Job Analysis that would suggest that the job of Transportation Dispatcher was not sedentary to light in nature.

## CONCLUSIONS OF THE COURT

The court, having considered all of the foregoing, concludes that both motions should be, and will be, denied.

This 21st day of January, 2003.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

---

[21] Unum also argues that *Holzschuh* is distinguishable, because in that case, the plaintiff had already been receiving benefits for over a year. 2002 WL 1609983 at * 1, 7.